1
2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

3

**AIXA ACEVEDO-MILÁN**,

4

**Plaintiff,**

5

**v.**                                                    **CIVIL NO. 18-1526 (GAG)**

6

**HOME ETC. INCORPORADO D/B/A
TODAY'S SATELLITE TELEVISION,
ET AL.,**

7

8

**Defendants.**

9

**OPINION AND ORDER**

10

        Plaintiff Ms. Aixa Acevedo-Milán ("Ms. Acevedo-Milán") brings this action against Home

11

Etc. Incorporado d/b/a Today's Satellite Television ("TST"), MCR Enterprises, LLC ("MCR"), Mr.

12

Randolph T. Cravey, Ms. Ivelisse Pagán-Matos, Ms. Sheila González-Chaparro (collectively,

13

"Defendants") alleging gender and pregnancy discrimination in violation of Title VII of the Civil

14

Rights Act ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and the Pregnancy Discrimination Act of 1978

15

("PDA"), 42 U.S.C. § 2000e(k). (Docket No. 1). Plaintiff argues pregnancy discrimination in the

16

modalities of disparate treatment and hostile work environment and claims retaliation and

17

constructive discharge under Title VII, 42 U. S.C. § 2000e-3 (a). Id. Additionally, Ms.

18

Acevedo-Milán contends that Defendants failed to provide certain employment benefits, pursuant to

19

the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654. Id. Finally, Plaintiff invokes

20

the Court's supplemental jurisdiction to bring claims under Puerto Rico Law 100 of June 30, 1959

21

("Law 100"), P.R. LAWS ANN. tit. 29, §§ 146 *et seq*.; Puerto Rico Law 80 of May 30, 1976 ("Law

22

80"), P.R. LAWS ANN. tit. 29, §§185a *et seq*.; Puerto Rico Law 115 of December 20, 1991 ("Law

23

115"), P.R. LAWS ANN. tit. 29, § 194a; Article 1802 and 1803 of the Civil Code of Puerto Rico, P.R.

24

Civil No. 18-1526 (GAG)

LAWS ANN. tit. 31, §§ 5141-5143 ("Article 1802 and 1803"), and Commonwealth of Puerto Rico's Constitution. P.R. CONST. Art. II, §§ 1; 8; 16. (Docket No. 1).

Essentially, Ms. Acevedo-Milán alleges that she was promoted, demoted two months later – shortly after announcing her pregnancy– and then forced to resign. (Docket No. 1). Plaintiff further argues that she experienced a hostile work environment, which allegedly caused her a miscarriage. Id. The latter incident occurred two days after she participated in a "humiliating" meeting with her supervisors. Id. Defendants move for summary judgment and posit that TST entered into a process of business restructuring as a result of a decrease in the company's retail sales and that said process coincided with Plaintiff's pregnancy and employment change. (Docket No. 88). Defendants put forward that they never discriminated against Ms. Acevedo-Milán. Id. at 9. Plaintiff opposes, arguing that the reorganization served as a "pretext" to hide the discriminatory nature of the adverse employment actions taken against her. (Docket No. 106). Ms. Acevedo-Milán avers that material issues of facts preclude summary disposition of this case. Id. at 6. Defendants filed a reply and Plaintiff a sur-reply thereafter. (Docket Nos. 115; 123)

Also pending before the Court is Defendants' Motion in limine, seeking to exclude testimony regarding Ms. Acevedo-Milán's miscarriage. (Docket No. 125). Plaintiff filed a response in opposition stating that her treating physician will testify as a "percipient witness," not as an expert, and thus, his testimony should not be excluded. (Docket No. 130). Defendants replied thereafter (Docket No. 132-1).

After carefully reviewing the parties' submissions, notably the deposition testimonies on the record, and pertinent applicable law, the Court hereby **DENIES IN PART and GRANTS IN PART** Defendant's Motion for Summary Judgment at Docket No. 88. Furthermore, the Court **DENIES**

Civil No. 18-1526 (GAG)

Defendants' Motion in Limine at Docket No. 125, yet constrains the scope of Plaintiff's announced witness.

**I.      Relevant Factual Background**

A.  Local Rule 56

Defendants proposed a statement of 139 uncontested facts to establish that summary judgment should be granted in their favor. (Docket No. 87). Plaintiff denied and qualified several of these facts and further proposed a statement of 173 additional uncontested facts narrating her version of the case. (Docket No. 105). Defendants replied to each additional fact and addressed numerous of Plaintiff's denials and qualifications. (Docket Nos. 115; 115-1).

Although, the primary purpose of Local Rule 56(b), L. Cv. R. 56(b), "is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Mkt. Inv., LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008), a court "must responsibly review the record, especially the evidence upon which the statement of uncontested facts is based on, to adequately evaluate a motion for summary judgment." See Reyes Caballero v. Oriental Bank, Civil No. 16-2952 (GAG), 2019 WL 6330812 at *2 (D.P.R. 2019); see also Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (Under Rule 56, "the court should review the record as a whole.").

Bearing this in mind, the Court holds that Plaintiff fails to properly contest most of Defendant's proposed facts. (Docket No. 105). As a result, several of these facts have been deemed as unopposed. Similarly, as to Plaintiff's Statement of Additional Facts, the Court also finds that certain facts present improper or conclusory assertions that cannot be considered at the summary judgment stage. (Docket No. 105). Defendants, on their part, also fail to properly contest many facts contained in Plaintiff's Statement of Additional Facts and thus, various facts will also be considered

Civil No. 18-1526 (GAG)

as unopposed. (Docket No. 115-1). However, as to both parties, the Court shall highlight those facts that have been appropriately qualified or denied.

As a whole, the Court rules that Ms. Acevedo-Milán has presented a version of the case, supported on witness testimony and documents, that establishes genuine issues of material fact as to several claims that must left for a reasonable jury to decide. (Docket No. 105). In spite of overall non-compliance with Local Rule 56(b), "the Court firmly believes in access to justice, the lack of which is a serious problem in Puerto Rico, and feels uncomfortable completely disregarding" certain additional facts that tell the story of how Plaintiff allegedly suffered pregnancy discrimination. Natal Pérez v. Oriental Bank & Tr., 291 F. Supp. 3d 215, 221 (D.P.R. 2018). "Balancing its interests in efficiency and access to justice," the Court will consider and reference directly parts of Ms. Acevedo-Milán's deposition testimony, as well as that of co-workers Ms. Michelle Rivera-Martínez, Ms. Giselle Rivera-Cotty, and Mr. Orlando Sanoguet-Valentín in which they recount alleged discriminatory episodes. Id. These access to justice considerations, along with Rule 56 requirements, compel the Court to display a chronological timeline that "construe the evidence in the light most flattering to the nonmovants [Ms. Acevedo-Milán] and indulge all reasonable inferences in [her] favor." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).

The subsequent factual background includes a factual background summary of the case, specifically events that befell before Plaintiff announced her pregnancy, and then the disputed version of the facts after Ms. Acevedo-Milán announced that she was pregnant.

B.  TST's Corporate Structure and Financial Situation

Defendant TST is an authorized retailer of Dish Puerto Rico that sells television programming services and installs programming services for its customers on the island. (Docket

Civil No. 18-1526 (GAG)

Nos. 87 ¶¶ 1, 2; 105 ¶¶ 1,2).[1] At the time of the events, TST's upper-management was composed of Defendants Mr. Randolph T. Cravey, as Chief Executive Officer and President ("CEO Cravey"); Ms. Ivelisse Pagán-Matos, as the General Manager ("GM Pagán-Matos"), and Ms. Sheila González-Chaparro, as the Human Resources Manager ("HR González-Chaparro"). (Docket Nos. 87 ¶¶ 9, 10, 12, 13; 105 ¶¶ 10, 12, 13). Since 2016, TST's upper-management met on a monthly basis, without the presence of other employees, to discuss business operations. (Docket Nos. 87 ¶¶ 14, 16, 17; 105 ¶¶ 14, 16, 17). TST had in place a non-discrimination policy that prohibits unequal treatment based on pregnancy, among other protected categories. (Docket No. 87 ¶ 18; 105 ¶ 18).

During 2015, TST's retail sales in Puerto Rico averaged 455 sales per month. (Docket Nos. 87 ¶ 19; 105 ¶ 19). In early 2016, TST monthly retail sales dropped and fluctuated from 228 to 287 sales. (Docket No. 87 ¶¶ 20-23; 105 ¶¶ 20-23). By late 2016, TST retail sales dropped again to 164 sales in October, 134 sales in November and 156 sales in December. Id. Defendants advance that due to the decline in retail sales during the final months of 2016, CEO Cravey decided to restructure TST's Sales and Marketing Department. (Docket No. 87 ¶ 26). This restructuring was implemented between January and February 2017. (Docket No. 87 ¶ 27).

According to the flow charts submitted to the record, by October 31, 2016, aside from the company's stockholders, CEO Cravey (who himself was a stockholder) held the highest company position, followed by GM Pagán-Mátos. (Docket No. 87-1 at 27). At the time, a "Manager" led the Sales and Marketing and Financial Departments. Id. The "Sales and Marketing Manager" position was vacant at the time. Id. In terms of organizational authority, underneath "Managers" were

---

[1] Defendant MCR Enterprises is also an authorized retailer of Dish Puerto Rico that sells television programming packages and installs satellite antennas in the U.S. Virgin Islands. (Docket Nos. 87 ¶¶ 4-5; 105 ¶¶ 4-5). TST provides support services to MCR, including accounting services, dispatching support services and marketing services, among others. (Docket Nos. 87 ¶ 6; 105 ¶ 6). According to Defendants, none of the TST employees, including Plaintiff, ever received compensation from MCR. (Docket Nos. 87 ¶ 8; 105 ¶ 8).

Civil No. 18-1526 (GAG)

"Directors" and/or "Supervisors." (Docket No. 87-1 at 27). In late 2016, Plaintiff held the position of "Marketing Director" and supervised the areas of "Independent Sales," "Call Center," and "Order Processing." Id. By January 13, 2017, the Sales and Marketing Department was led by a "Sales Manager" and "Marketing Director." (Docket No. 87-1 at 28). In the early 2017 organizational flow chart, there is no longer a reference to a "Sales Marketing Manager" and the "Order Processing" group or department was no longer within the Marketing Director's purview but had its own "Order Processing Supervisor." Id. In early January 2017, Plaintiff still held the position of "Marketing Director." Id. This structure remained the same in the flow chart submitted to the record and revised on February 13, 2017; except for the fact that the "Order Processing" group or department was separated from the Sales and Marketing Department. Id. at 29.

Ms. Acevedo-Milán was originally hired as "Hughes Marketing Coordinator" in 2012 and promoted to "Sales and Marketing Director" in 2013. (Docket No. 87 ¶¶ 30-31; 105 ¶¶ 30-31). Due to the company's different reorganizations, Plaintiff's title and responsibilities changed, on more than one occasion, to that of "Marketing Director." (Docket No. 87 ¶¶ 32, 34, 36; 105 ¶¶ 32, 34). As explained above, this was the position she held in late 2016 and early 2017.

On September 2016, the "Sales and Marketing Manager" resigned and the sales department employees were instructed to report to Plaintiff. (Docket No. 87 ¶ 42; 105 ¶ 42). A replacement was eventually hired in December 2016 under the "Sales Manager" title. (Docket No. 87 ¶ 44; 105 ¶ 44). The new Sales Manager, however, lasted over two months and was terminated by GM Pagán-Matos on February 21, 2017 for failing to comply with the position's expectations and conditions. (Docket No. 87 ¶¶ 48-49; 105 ¶¶ 48-49).

To fill this vacancy, GM Pagán-Matos and HR González-Chaparro gave Ms. Acevedo-Milán the "Sales and Marketing Manager" position. (Docket No. 87 ¶ 50; 105 ¶ 50). This position change

Civil No. 18-1526 (GAG)

represented a title promotion, yet not a weekly-salary increase, (Docket No. 105-2), and it became effective on February 27, 2017. (Docket No. 87 ¶ 52; 105 ¶ 52).

After this employment decision was made, sometime between late February and early March 2017, GM Pagán-Matos and HR González-Chaparro had a conference call with CEO Cravey to inform him about the position change. (Docket No. 87 ¶ 51, 53; 105 ¶ 51). He disagreed with said moved and told them that making Plaintiff a "Manager" was not the correct decision. (Docket No. 87 ¶ 54; 105 ¶ 54). On March 10, 2017 during an upper-management meeting, CEO Cravey informed GM Pagán-Matos and HR González-Chaparro about his intention to continue restructuring the Sales and Marketing Department. (Docket No. 87 ¶ 55; 105 ¶ 55). In this meeting, according to evidence submitted to the record, a possible reduction of hours was discussed for hourly-employees. (Docket Nos. 87 ¶ 56; 105 ¶ 56; 87-6 at 45).[2] The Court highlights that from the notes submitted to the record there is no mention suggesting that Plaintiff's employment change was specifically discussed in the March 10 meeting. (Docket No. 87-6 at 44).

Two weeks later, on March 23, 2017, GM Pagán-Matos conducted, alongside HR González-Chaparro, a meeting with regional managers and others supervisors from the Sales and Marketing Department. (Docket No. 87 ¶ 60). She informed them that, starting on April 2017, there would be a reduction of hours for employees. Id. The reduction would be from 40 to 32 hours, saving the company a total of $12,878.81 in monthly salary payments and that it would affect around 44 employees. (Docket No. 87 ¶ 61-62; 105 ¶¶ 61-62).[3] Plaintiff qualifies the previous facts and states

---

[2] Ms. Acevedo-Milán qualifies this previous fact and emphasized that the reductions was only for hourly pay employees, not salaried employees. (Docket No. 105 ¶ 106). The fact is supported by the record and admitted as qualified. See L. Cv. R. 56(e) (D.P.R. 2009).

[3] Once again, Plaintiff qualifies that this reduction was only four hourly employees, not salaried employees. Similarly, the fact is supported by the record and admitted as qualified. See L. Cv. R. 56(e) (D.P.R. 2009).

Civil No. 18-1526 (GAG)

that she did not participate in the March 23, 2017 meeting because she was on leave of absence and learned about the hour reductions later on through HR González-Chaparro. (Docket No. 105 ¶ 60).[4]

On March 24, 2017, Plaintiff announced to the company that she was pregnant (the day after she found out about it). (Docket No. 87 ¶ 105; 105 ¶ 105). Her co-workers celebrated the occasion by placing a "Congratulations to the new mother!" banner and holding a "party" at the office. (Docket No. 87 ¶¶105-107; 105 ¶¶ 105-107).[5]

C.  Pregnancy and Employment Change: Defendants' Version of the Facts

After the announcement, Ms. Acevedo-Milán was absent from work between March 28 and 31 because she was ordered bed-rest by her physician. (Docket No. 87 ¶¶ 113-114; 105 ¶¶ 113-114). Plaintiff returned to work on April 3, yet on April 6 –while traveling with co-workers Mr. Sanoguet-Valentín and Ms. Rivera-Martínez– she started bleeding and had to be taken to the hospital. (Docket No. 87 ¶¶ 115-116; 105 ¶¶115-116). Defendants advance that no meeting, involving the Sales and Marketing employees, were held between April 3 and 6. (Docket No. 87 ¶ 64).[6]

On April 7, 2017, Plaintiff informed GM Pagán-Matos and HR González-Chaparro that she was ordered again bed-rest and would not attend work that day. (Docket No. 87 ¶ 117; 105 ¶117). A meeting was held on said date with the Sales and Marketing employees, including Mr. Sanoguet-Valentín, Ms. Yaritza González and Ms. Rivera-Martínez, to discuss the decrease trend in the retail sales. (Docket No. 87 ¶ 65).

---

[4] According to the record, however, Plaintiff did receive an e-mail invitation to said meeting. (Docket No. 87-8 at 170).

[5] Plaintiff qualifies this description and rather advances that her co-workers organized a gathering to eat appetizers and giver her two gifts. (Docket No. 105 ¶ 105). This qualification is proper and noted. See L. CV. R. 56(e) (D.P.R. 2009).

[6] Plaintiff denies this proposition based on information she received from co-workers about an alleged meeting celebrated on April 6. (Docket No. 105 ¶ 64). At the summary judgment stage, this constitutes inadmissible hearsay as to the truth of the matter and thus, the proposed fact stands as presented. See L. CV. R. 56(e) (D.P.R. 2009); Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016).

Civil No. 18-1526 (GAG)

On April 10, 2017 Plaintiff returned to work and on this date CEO Cravey found out about her pregnancy. (Docket No. 87 ¶¶ 110,119).[7] He did not attend the "party" on March 24, 2017 because he was on vacation celebrating his wedding anniversary and did not returned to the office until April 10. (Docket No. 87 ¶¶ 108-109).

Early morning on April 11, while at the office, Plaintiff started bleeding once more and had to be taken to the hospital. (Docket No. 87 ¶¶ 120, 122; 105 ¶¶ 120, 122). She informed GM Pagán-Matos and HR González-Chaparro, via email, about this incident. (Docket No. 87 ¶ 121; 105 ¶ 121). Ms. Acevedo-Milán's physician ordered bed-rest until April 20, 2017. (Docket No. 87 ¶ 122; 105 ¶ 122).

While Plaintiff was on medical leave, on April 12, 2017 a TST upper-management meeting was held. (Docket No. 87 ¶ 66). In the meeting, CEO Cravey discussed the upcoming changes in the Sales and Marketing Department. Id. Fundamentally, he explained that sales efforts would change from a "regional" to "channels/type of sales" approach (kiosks, door-to-door, malls, etc.). (Docket No. 87 ¶¶ 68-72; 105 ¶¶ 69-71). Before this move, the Sales Department had regional managers in different locations around the island that supervised all sales within the assigned region. (Docket No. 87 ¶ 69; 105 ¶ 69). According to meeting notes from April 12, CEO Cravey notified upper-management that Plaintiff's position as "Sales and Marketing Manager" would be changed to "marketing support" because he believed that marketing was her primary skill. (Docket No. 87 ¶¶ 73, 75; 105 ¶¶ 73). It is Defendants' position that the move responded to a reduction in sales and revenues and was not due to Plaintiff's pregnancy. (Docket No. 87 ¶ 74). These changes would became effective on May 1, 2017. (Docket No. 87 ¶ 78).

---

[7] Plaintiff denies this fact and advances that CEO Cravey learned about Plaintiff's pregnancy on March 24, 2017 and that he attended the "party" celebrating the occasion. (Docket No.105 ¶¶ 108,110). From the evidence submitted to record, it can be inferred otherwise. (Docket Nos. 87-1 at 8-15; 87-2). Thus, the proposed fact stands as proffered. See L. Cv. R. 56(e) (D.P.R. 2009).

Civil No. 18-1526 (GAG)

On April 25, 2017, after Ms. Acevedo-Milán had already returned from medical leave (Docket No. 87 ¶ 125; 105 ¶ 125), HR González-Chaparro called Plaintiff into a meeting and informed her about CEO Cravey's new vision for the company, including her new employment role and responsibilities. (Docket No. 87 ¶¶ 79, 84; 105 ¶¶ 79, 84). GM Pagán-Matos was later brought to the meeting and further explained that she would now be named "Marketing Coordinator," which would entail providing marketing support to each sales-channel. (Docket No. 87 ¶¶ 80-81).[8] During this meeting, Plaintiff was provided with a "Position Change Form" which detailed that she would receive a weekly-pay decrease from $565.12 to $455. (Docket No. 87 ¶ 82-83; 87-10; 105 ¶ 83). According to Defendants, she would still be part of the management team, even without a managerial role. (Docket No. 87 ¶ 86). Plaintiff was informed that the "Sales and Marketing Manager" position would be eliminated and she would continue to report to GM Pagán-Matos. (Docket No. 87 ¶¶ 87-88).

Defendants explain that, on April 26, 2017, a total four employees were terminated due to reduction of sales (Docket No. 87 ¶¶ 89-92; 105 ¶¶ 89-92) and that Ms. Yaritza González, who worked as Order Processing Supervisor, would also be given the title and responsibilities of a "Retail Sales Manager." (Docket No. 87 ¶ 93). Defendants state that Ms. González would be in the same "hierarchal level" as Plaintiff and that she would continue to receive a weekly-salary of $455. (Docket No. 87 ¶¶ 94-96). Similarly, Defendants explain that the "Regional Sales Manager" position held by Mr. Sanoguet-Valentín would be eliminated and that he, alongside other employees from

---

[8] Throughout her submissions to the Court, Plaintiff argues that the proposed position change was from "Marketing Director" to "Marketing Associate." (Docket No. 105 ¶ 81). This fact is based on a flow chart submitted to record which was allegedly prepared by Defendants. (Docket No. 105-3). Aside from this chart, other evidence submitted to the record, including Plaintiff's own Complaint, indicate that the new position would have been "Marketing Coordinator." (Docket No. 87-10). The Court will continue to use "Marketing Coordinator," but rules there might be a possible issues of fact as to Plaintiff's title due to the position change.

Civil No. 18-1526 (GAG)

the Department, were to be assigned specific sales-channels. (Docket No. 87 ¶¶ 97, 99-102; 105 ¶¶ 100. 102).

On April 27, 2017, Ms. Acevedo-Milán suffered a miscarriage. (Docket No. 87 ¶ 127; 105 ¶ 127). She stayed on maternity leave until June 27, 2017. (Docket No. 87 ¶ 128; 105 ¶ 128). While on leave, at the request of GM Pagán-Matos, an Information Technology (IT) employee reset Plaintiff's work e-mail because the company needed information contained in them to continue business operations. (Docket No. 87 ¶ 130; 105 ¶ 130). Ms. Acevedo-Milán was supposed to return to the office on June 28, 2017, yet on said date she presented her letter of resignation. (Docket No. 87 ¶¶ 131-132; 105 ¶¶ 131-132). Plaintiff's salary reduction and position changes was never put into effect. (Docket No. 87 ¶ 129). Her medical plan was cancelled effective June 30, 2017. (Docket No. 87 ¶ 138). Defendants put forward that, on September 28, 2017, the company terminated four other employees due to continuing drop in retail sales, including Mr. Sanoguet-Valentín and Ms. Rivera-Martínez. (Docket No. 87 ¶ 139).[9]

D.  Pregnancy and Employment Change: Plaintiff's Version of the Facts

As indicated previously, bearing in mind access to justice considerations and construing the evidence "in the light most flattering" to Ms. Acevedo-Milán, the Court shall consider the whole record and make direct references to witnesses deposition testimony. See Iverson, 452 F.3d at 98; Natal Pérez, 291 F. Supp. 3d at 221.

After announcing the pregnancy on March 24, 2017, Plaintiff and her co-workers noticed that upper-management, notably GM Pagán-Matos, were "uncomfortable" with this reality to the extent that Ms. Acevedo-Milán felt "humiliated" on more than one occasion. (Docket Nos. 87-7 at

---

[9] Plaintiff denies this fact, arguing that these employees were terminated because of Hurricane María. (Docket No. 105 ¶ 139). This contention is supported by the deposition testimony of Ms. Rivera-Martínez. Id. Although the denial does not in itself controvert this fact, the Court takes judicial notices, pursuant to FED. R. EVID. 201, of the fact that Hurricane María made landfall just eight days before these layoffs.

**Civil No. 18-1526 (GAG)**

1   139; Docket No. 105-6 at 29). Specifically, co-worker Ms. Rivera-Cotty stated that "[w]hen

2   [Plaintiff] was absent for medical reasons . . . [GM Pagán-Matos] appeared to be upset. You could

3   tell that there was friction." (Docket Nos. 105 ¶ 18; 105-6 at 11). Co-worker Ms. Rivera-Martínez

4   also commented that the upper-management's "attitude changed" after Plaintiff announced her

5   pregnancy. (Docket Nos. 87-7 at 11; Docket Nos. 105 ¶ 17). Ms. Rivera-Martínez and Mr. Sanoguet-

6   Valentín elicited that meetings about sales and marketing strategies were held while Plaintiff was on

7   medical leave. (Docket Nos. 105 ¶¶ 20; 87-7 at 17-19; 87-12 at 51-56, 61-62). However, they did

8   not specified nor remembered exactly how many meetings were held (three or four) and on which

9   dates they took place (between April 3-7 or April 11-20). Id.[10]

10        While Ms. Acevedo-Milán was on ordered bed-rest, Ms. Rivera-Cotty also remarked that

11   GM Pagán-Matos would "question [Plaintiff's] performance based on the fact that she was pregnant"

12   and comment that "her absences were affecting the [sales] numbers." (Docket Nos. 105 ¶ 26; 105-6

13   at 31-32). Along those lines, Ms. Rivera-Martínez indicated that due to sale decrease and Plaintiff's

14   absences in April 2017, GM Pagán-Matos made comments about how the company "needed to

15   improve and to find a way to help to make the figures because [Plaintiff] was no longer there; and .

16   . . That was a loss for her. That had no way of controlling the work that was being done." (Docket

17   Nos. 105 ¶ 27; 87-7 at 22).[11]

18        As displayed earlier, Plaintiff was ordered bed-rest, due to medical issues concerning her

19   pregnancy on three occasions, between: (1) March 28-31; (2) April 6-10; (3) April 11-20. (Docket

---

[10] Defendants deny that meetings were held in Plaintiff's absence. (Docket No. 115-1 ¶ 20). However, these deposition testimonies provide information about said purported meetings, which would require the Court to make impermissible credibility determinations and weigh in evidence. Thus, there is a genuine issue of material fact as to whether this meetings took place. See Reeves, 530 U.S. at 135.

[11] Defendants improperly deny this assertion, but clarify these alleged comments made were in reference for TST necessity to have a plan in case Plaintiff, as a Marketing and Sales Manager, was not available. (Docket No. 115-1 at 54). The Court notes this qualification. See L. Cv. R. 56(e) (D.P.R. 2009).

No. 87 ¶¶ 113-117; 120-122; 105 ¶¶ 113-117; 120-122). After the April 12 upper-management meeting in which CEO Cravey announced the Sales and Marketing Department's restructuring, several employees met with supervisors to "brainstorm" about the idea of changing the structure from regional to channel sales. (Docket Nos. 105 ¶ 31).[12] According to the case's chronological timeline, Plaintiff was not involved in these brainstorming sessions because she was absent on medical leave. Nonetheless, after she returned from her third medical leave on April 20, 2017, Ms. Acevedo-Milán asked GM Pagán-Matos for a meeting because she felt the Sales and Marketing "employees were acting differently." (Docket Nos. 105 ¶ 36; 87-8 at 68). Plaintiff allegedly told GM Pagán-Matos that she saw Mr. Sanoguet-Valentín, and other employees, meeting with her and she had not been invited. (Docket No. 87-8 at 68). After the alleged meeting, Mr. Sanoguet-Valentín told Plaintiff that "changes were coming." (Docket No 87-8 at 76).

Defendants' proposed Statement of Uncontested Facts contained a summarized version of the April 25, 2017 meeting. (Docket No. 87 ¶¶ 79-88). Ms. Acevedo-Milán proffered over 60 additional facts about what occurred that afternoon. (Docket No. 105 ¶¶ 57-124). Defendants improperly deny most of the proffered facts when indeed they actually sought to qualify them. (Docket No. 115-1 at 68-89). See L. Cv. R. 56(e) (D.P.R. 2009); Natal Pérez, 291 F. Supp. 3d at 219 ("A qualification is a modification or limitation of terms or language; esp., a restriction of terms that would otherwise be interpreted broadly." Qualification, BLACK'S LAW DICTIONARY 1436 (10th ed. 2014) (internal quotation marks and modifications omitted)). The Court notes their general objection as to Plaintiff's version of the facts; however, the undersigned shall let the record speak for itself

---

[12] This fact was drafted taking into consideration Defendants' qualification. (Docket No. 115-1 at 56-57). Moreover, Plaintiff asserts her pregnancy was the subject of discussion during the April 6, 7 and 12 meetings. (Docket No. 105 at 19-20). However, this assertion is not supported by the record. Ms. Acevedo-Milán was not present at the office during those days and lacks personal knowledge about said information and HR González-Chaparro's deposition testimony does not corroborate it either. (Docket Nos. 87-9 at 15-19, 48-50; 87-8 at 43-53).

and cite directly from Plaintiff's deposition testimony. If Defendants' qualifications or denials are warranted, they shall be addressed accordingly.

On April 25, 2017, around 4:30 p.m., HR González-Chaparro asked Plaintiff to join her for a meeting. (Docket Nos. 105 ¶ 57; 115-1 at 69). The meeting began only with HR González-Chaparro and Ms. Aceveo-Milán present. (Docket No. 105 ¶ 59). HR González-Chaparro informed Plaintiff about her new role as marketing support, position title change, and salary reduction. (Docket No. 105 ¶ 60). HR González-Chaparro explained that her duties would be divided among several employees and, according to Plaintiff, HR González-Chaparro told her that change "was a good opportunity for [her] to be calmed, [she] would not have to travel and that [she] could *be calmer, you know, due to [the] pregnancy*." (Docket Nos. 105 ¶ 63; 87-6 at 86) (emphasis added).

Specifically as to her responsibilities, HR González-Chaparro informed Plaintiff that her "sales duty" would be transferred to Ms. Yaritza González; that her work with the Virgin Island's office would be transferred to Mr. Jonathan Lespier; that "all thing related to malls and kiosks" would be transferred to Ms. Rivera-Cotty, and that "all things had to do with trainings and independent salespersons" would be transferred to Ms. Frances Muñoz. (Docket Nos. 105 ¶¶ 65-68; 87-6 at 86-87). Furthermore, Ms. Acevedo-Milán would now have to train Ms. González and provide all her contact information to Mr. Lespier. (Docket No. 87-6 at 86). Plaintiff explained that she was "being placed in a data entry position" and "really felt like being drop flat into the floor . . . [She] was totally surprised." (Docket No. 87-6 at 87). When Ms. Acevedo-Milán told HR González-Chaparro that the salary decrease would affect her economic plans, she responded "not be worried because [she] would be calmer, [she] would not have the stress due to the numbers" and "told [her] repeatedly that this was [CEO Cravey's] new vision." (Docket No. 87-6 at 89).[13]

---

[13] Defendants deny and object to specific wording about the conversation between Plaintiff and HR González-Chaparro during the April 25 meeting by arguing it constitute inadmissible hearsay testimony. The Court disagrees

Ms. Acevedo-Milán questioned HR González-Chaparro again and manifested that "it had to do with [her] pregnancy and that [she] found that it was totally unfair that they would be making that change . . . [that it is] because [she] was pregnant and they understood that their numbers were being affected; that it was not new vision at all." (Docket No. 87-6 at 89). After Plaintiff made this comment, HR González-Chaparro went to look for GM Pagán-Matos who could "help her understand what was going on." (Docket No. 87-6 at 89).

Ms. Acevedo-Milán regarded that GM Pagán-Matos "came in with a very bad attitude" and asked her "what part of what [HR González-Chaparro] was telling [her] [she] did not understand." (Docket No. 87-6 at 92).[14] Plaintiff stated that she did not understand the changes; why she was being moved from a management position to a "data entry level" position; why she could not get back her previous employment position, and that she considered that said changes were made because she was pregnant. (Docket No. 105 ¶ 77).

As soon as Ms. Acevedo-Milán mentioned her pregnancy, she asserts that GM Pagán-Matos reacted as follows:

> She got upset and she said this had nothing to do with my pregnancy. That she deemed that to be disrespectful for me to think that it had to do with my pregnancy, that this was the new company vision, and that [CEO Cravey] did not know that I was pregnant. And I answered that, yes, that [CEO Cravey] had knowledge of it. That he had even congratulated me and that he was aware that I was pregnant and that I knew that they already had this planned. And she answered, who the fuck, that she said; who the fuck told me? And she banged the door twice.

---

with this unfounded legal argument. Ms. Acevedo-Milán, as declarant with personal knowledge, can indeed offer a statement about what transpired in a meeting she participated in. The Federal Rules of Evidence state that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. "Testimony is inadmissible under Rule 602 only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed what he testified to." United States v. Brown, 669 F.3d 10, 22 (1st Cir. 2012) (internal citations and quotation marks omitted).

[14] Defendants qualify this statement and advance that GM Pagán-Matos testified that she came into the meeting in a respectful manner and offered Plaintiff a "kiss and hug," which she denied. (Docket No. 87-5 at 12-13). The Court notes this objection, yet holds that evaluating it requires making impermissible credibility considerations. See L. CV. R. 56(e) (D.P.R. 2009).

Civil No. 18-1526 (GAG)

. . .

> [T]hose changes were going to be made, that that was confidential information of the company. I then told her that I was told about. She told me she wanted who the fuck had told me and she continued banging the table with her fist. I told her that [Mr. Sanoguet-Valentín] had told me, that she had met with him before calling me to the meeting and then they called [Mr. Sanoguet-Valentín]. I told her that I was feeling ill, that I was not really in the position to be part of those discussions, that I was pregnant, that I was feeling ill. She told me to shut up, to sit down, that they were going to bring in [Mr. Sanoguet-Valentín].

(Docket No. 87-8 at 92-94).[15]

Mr. Sanoguet-Valentín testified that before he was called into the conference room he could hear "yelling and a mess." (Docket No. 87-12 at 63). Similarly, according to Ms. Rivera-Martínez, other employees in the office and could here the yelling, pounding on the table and the situation inside the conference room. (Docket No. 87-7 at 41-43).

When Mr. Sanoguet-Valentín entered the conference room, GM Pagán-Matos asked "who authorized [you] to provide [Plaintiff] with confidential information" and that "there was no reason for them to discuss that with [her]." (Docket Nos. 87-8 at 94; 87-12 at 65).[16] He answered that there was nothing wrong with informing Plaintiff, who was his immediate supervisor. (Docket No. 87-12 at 64-65). Ms. Acevedo-Milán remarked that GM Pagán-Matos "began threatening him, telling him that it was company confidential information, that she was going to go against his personal file, that he would receive an admonishment." (Docket Nos. 87-8 at 94-95). To which Mr. Sanoguet-Valentín apparently insisted that he had done nothing wrong and, according to Plaintiff, told her: "My gosh! That woman is pregnant. Why [is she] being put on that spot?" (Docket Nos. 87-8 at 95). During his

---

[15] Defendants qualify this statement and posit that GM Pagán-Matos did not use the word "fuck" (Docket No.115-1 at 77). The Court notes this objection, yet rules that evaluating it requires making impermissible credibility considerations See L. CV. R. 56(e) (D.P.R. 2009).

[16] Defendants state that this specific comment allegedly made by GM Pagán-Matos arouse because TST employees are aware that the company has a confidentiality policy regarding what is discussed in meetings unless authorized by a supervisor. (Docket No. 115-1 at 19). The Court notes that, at the time of the events, TST had a confidentiality policy in place. (Docket Nos. 87 ¶¶ 15-16; 105 ¶¶ 15-16).

Civil No. 18-1526 (GAG)

deposition Mr. Sanoguet-Valentín said that in this precise moment he asked himself "does this lady [GM Pagán-Matos] know that [Plaintiff] is pregnant? Even [HR González-Chaparro] looked at me and we looked at each other, like, you know, what's going on here? This was a merciless attack with no mercy whatsoever towards a pregnant woman." (Docket No. 87-12 at 73). He further commented that he had been a manager several times and "had never seen such a terrible abuse as the one that was committed against Plaintiff. That's damnable" (Docket No. 87-12 at 74). While this exchange was happening, Plaintiff said that she "was feeling ill, that [she] wanted to go away" and GM Pagán-Matos told her "to shut up, to sit down, that the meeting had not yet ended." (Docket Nos. 87-8 at 94-95).[17]

Eventually, Mr. Sanoguet-Valentín was told he could leave, Plaintiff was allowed to take picture of the documents containing her employment change and was reminded "everything discussed in [the] meeting was company confidential information and [had] to remain very quiet." (Docket Nos. 105 ¶ 106-108; 87-8 at 97). Ms. Acevedo-Milán cried during the meeting and came out crying after it was over. (Docket No. 105 ¶¶ 112-113). After the April 25 meeting, Plaintiff claims she did not have access to her Company email, server and was removed from the WhatsApp chat groups. (Docket No. 105 ¶ 130).

Two days later, on April 27, 2017, after having contractions for more than 7 hours, Ms. Acevedo-Milán had a miscarriage and lost her baby. (Docket No. 105 ¶ 143). Plaintiff claims that this was due to "the great level of stress and anxiety" she was submitted by Defendants. Id.[18]

---

[17] The Court notes, once again, that Defendants improperly deny the entire exchange that allegedly took place when Mr. Sanoguet-Valentín came into the conference room. This across the board denial would inevitable require the Court to make impermissible credibility considerations and further adds to the undersigned's decision to leave this matter to an impartial jury. See Reeves, 530 U.S. at 135.

[18] Whether Plaintiff can present witness testimony to establish that Defendants "contributed" to her miscarriage is addressed in Section V of this Opinion & Order.

Civil No. 18-1526 (GAG)

Plaintiff advances that Ms. Yaritza González was her *de facto* replacement. (Docket No. 105 ¶¶ 135, 142).[19] After the April 2017 reorganization, as explained before, Ms. González received a new position title and different responsibilities, yet her salary remained at $455. (Docket No. 87 ¶¶ 93-96). However, her job description level was labeled as "High" while Plaintiff's job description was marked as "Medium." (Docket Nos. 105 ¶ 137; 115-1 at 97). Ms. González received a weekly-pay raise almost one year after Ms. Acevedo-Milán left TST. (Docket No. 105-5). Since the April 2017 reorganization, Mr. Sanoguet-Valentín also received a new position title and different responsibilities, yet his salary remained the same at $500 (which, was higher than that of Ms. González and that recommended for Plaintiff). (Docket No. 87-12 at 84-91).[20]

## II.    Standard of Review

It is well-settled that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See FED. R. CIV. P. 56(a). A "genuine" issue is one that could be resolved in favor of either party, and a "material" fact is one that has the potential of affecting the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); see also Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). The moving party bears the initial burden of demonstrating the lack of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. The movant party also "must aver an absence of evidence to support the nonmoving party's case." Maldonado-Denis v. Castillo-Rodríguez, 23

---

[19] Defendants deny this fact and clarify Ms. González's position change would require her to jointly work with Plaintiff; yet after Ms. Acevedo-Milán resigned Ms. González eventually assumed many of Plaintiff's tasks and responsibilities. (Docket Nos. 115-1 at 91-95; 87-11; 105-7).

[20] Plaintiff improperly includes other proposed facts that the Court did not considered nor addressed for purposes of this ruling. See L. CV. R. 56(e) (D.P.R. 2009).

Civil No. 18-1526 (GAG)

F.3d 576, 581 (1st Cir. 1994). If not, then the burden "shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis, 23 F.3d at 581. The non-movant party may establish that a fact is genuinely in dispute by citing evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. Id. at 255. At this stage, the *court does not make credibility determinations or weigh the evidence*. Id. (emphasis added). Moreover, summary judgment may be appropriate if the parties "merely rest upon conclusory allegations, improbable inferences, and unsupported speculation." Rossy v. Roche Prod., Inc., 880 F.2d 621, 624 (1st Cir. 1989).

## III.   Legal Analysis and Discussion

### A.   Gender and Pregnancy Discrimination

Defendants move for summary judgment on Plaintiff's sex and pregnancy discrimination claim, under of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the PDA, 42 U.S.C. § 2000e(k), and argue that assuming that Ms. Acevedo-Milán has established a *prima facie* case of discrimination, they have proffered a legitimate non-discriminatory reason (company restructuring) for taking an adverse employment action against her. (Docket Nos. 88 at 15-23; 115 at 8-18). Plaintiff opposes averring that Defendant's alleged reason is pretextual and her demotion was motivated by her pregnancy and

that the "proximity" between the events timeline support her argument that there exist genuine material issues of facts that warrant a trial. (Docket Nos. 106 at 19-22; 123 at 10-15).

Title VII makes it an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978 ("PDA") extended Title VII's protection against discrimination to specifically include discrimination "because of or on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. § 2000e(k). Martínez-Burgos v. Guayama Corp., 656 F.3d 7, 12 (1st Cir. 2011). Hence, PDA clarified that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy. Id. The PDA's second clause says that employers must treat "women affected by pregnancy . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." Martínez-Burgos, 656 F.3d at 12; see also Young v. UPS Inc., 575 U.S. 206 (2015).

To establish employment discrimination under Title VII, a plaintiff may present direct or indirect evidence of discrimination. See Pagán-Alejandro v. PR ACDelco Serv. Ctr., Inc., 468 F. Supp. 2d 316, 324 (D.P.R. 2006). If confronted with direct evidence of discriminatory acts, "the defendant must then either deny the validity or the sufficiency of the employee's evidence, and have the jury decide whether the employee has proved discrimination by a preponderance of the evidence," or "prove that it would have made the same decision even if it had not taken the protected characteristic into account." Id. at 324-25 (internal citations omitted); see also Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424 (1st Cir. 2000).

Civil No. 18-1526 (GAG)

However, where there is no direct evidence of discrimination, the Court applies the McDonnell Douglas burden shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The initial burden falls upon Plaintiff to establish a *prima facie* case of pregnancy discrimination and Ms. Acevedo-Milán must show that: (1) she was pregnant or indicated an intention to become pregnant; (2) she was qualified for her position and/or performed her job satisfactorily; (3) the employer took an adverse employment action against her, and (4) the employer continued to have her duties performed by a comparably qualified person. See Smith v. F.W. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996).

Meeting the initial *prima facie* requirement is "not especially burdensome [and] [s]atisfaction of the *prima facie* burden creates a rebuttable presumption that discrimination prompted the challenged adverse employment action." Martínez-Burgos, 656 F.3d at 12 (internal quotation marks eliminated); see also Sánchez-Estrada v. MAPFRE Praico Ins. Co., 126 F. Supp. 3d 220, 232 (D.P.R. 2015). Defendants may then "rebut this presumption by articulating a non-discriminatory reason for the adverse employment action, which eliminates the presumption and shifts the burden back to [Plaintiff] to point to sufficient evidence to demonstrate that [the] proffered reason is mere pretext and that the true reason is discriminatory." Martínez-Burgos, 656 F.3d at 12 (internal citations omitted); see also Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).

When it boils down to "pretext," the First Circuit has endorsed several methods to analyze a Defendant's reasons: (1) a plaintiff may demonstrate that she was "treated differently than other similarly situated employees;" (2) she can also show "that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker," and (3) highlight "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the

Civil No. 18-1526 (GAG)

asserted non-discriminatory reasons." Pagán v. Banco Santander de Puerto Rico, Civil No. 09-1226 (JAG) 2011 WL 570552 at *8 (D.P.R. 2011); Kosereis, 331 F.3d at 213; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000).

Another factor to consider is that courts shall "not assume the role of super personnel departments to assess the merits or even the rationality of non-discriminatory business reasons." Maldonado-Maldonado v. Pantasia Mfg. Corp., 983 F. Supp. 58, 65 (D.P.R.1997) (citations omitted). Notwithstanding, "[w]hether or not trimming the fat from a company's organizational chart is a prudent practice in a particular business environment, the employer's decision to eliminate specific positions must not be tainted by a discriminatory animus." Smith, 76 F.3d at 423. Therefore, "an employer who selectively cleans house cannot hide behind convenient euphemisms such as downsizing' or 'streamlining." Id.; Mejias Miranda v. BBII Acquisition Corp., 120 F. Supp. 2d 157, 167 (D.P.R. 2000) (internal quotation marks omitted).

Finally, the First Circuit has been "particularly cautious about affirming an employer's motion for summary judgment on a discrimination claim when the case boils down to whether the employer's stated reasons are pretextual." Kosereis, 331 F.3d at 216; see also Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998); Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983); Douglas v. J.C. Penny Co., Inc., 422 F. Supp. 2d 260, 272 (D. Mass. 2006), aff'd, 474 F.3d 10 (1st Cir. 2007).

In this case, Defendants assume that Ms. Acevedo-Milán has established a *prima facie* case of pregnancy discrimination. The Court agrees that she has met this burden. At the time of the events: (1) Plaintiff was pregnant; (2) she was qualified for her job, to the extent of being promoted a few months before; (3) Defendants demoted her (position change and salary reduction), and (4) her duties

were continued to be performed by Ms. González, who was comparably qualified to her. See Smith, 76 F.3d at 421.

Defendants rebut this discrimination presumption alleging it is a legitimate business reason for Plaintiff's adverse employment action: TST's retail sales had been dropping since late 2016 and by early 2017 the company decide to restructure their Sales and Marketing Department, which Plaintiff headed. (Docket No. 88 at 18-22). Their position is that her pregnancy "coincided" with the company's reorganization which had been discussed by upper-management before the pregnancy was even announced. Id. Ms. Acevedo-Milán posits that the restructuring served as a "pretext" to demote her. (Docket Nos. 106 at 19-22). To support this position, she elicits that since the pregnancy was announced the company's attitude towards her negatively changed. (Docket Nos. 87-7 at 11; Docket Nos. 105 ¶ 17). Plaintiff's co-workers testified that GM Pagán-Matos made several comments as to how Plaintiff's pregnancy and related work absences were affecting TST's retail sale. (Docket Nos. 105 ¶¶ 26-27; 105-6 at 31-32; 87-7 at 22). Furthermore, these co-workers proffered that on April 2017 strategic meetings were celebrated with the Sales and Marketing employees, while Plaintiff was on medical leave. (Docket Nos. 105 ¶¶ 20; 87-7 at 17-19; 87-12 at 51-56, 61-62). On top of these facts, Ms. Acevedo-Milán detailed how she felt humiliated during the April 25, 2017 meeting when GM Pagán-Matos and HR González-Chaparro informed her about the demotion. (Docket No. 87-8 at 92-95). She even confronted them advancing that the demotion was due to her pregnancy, which allegedly upset GM Pagán-Matos. Id. In their Statement of Uncontested Facts, Defendants did not even care to address the alleged "humiliating" exchanges that occurred during this meeting. (Docket No. 87). Two days later, Plaintiff suffered a miscarriage which she attributes to the "stress and anxiety" that Defendants purportedly caused her.

The Court's also highlights that, according to the evidence of record, when hour reductions were suggested on March 10 and 23, 2017, they were only intended to affect hourly-employees, not salaried-employees, who were paid on a weekly-rate. (Docket Nos. 87 ¶¶ 56, 61-62; 105 ¶¶ 56, 61-62; 87-6 at 45). Plaintiff was a salaried-employee, not an hourly-employee. (Docket No. 87-6 at 45). And yet, she received both a position-change and salary reduction. (Docket No. 87-10). When compared to other salaried-employees, for example Ms. González and Mr. Sanoguet-Valentín, they both suffered position changes *but* maintained their previous weekly-salary pay. (Docket Nos. 87 ¶¶ 93-96; 87-12 at 84-91). Even though Plaintiff's demotion would have equated her weekly-salary to that of Ms. González's ($455), Mr. Sanoguet-Valentín, a male employee who Ms. Acevedo-Milán was going to continue supervising, maintained a higher salary ($500) than *both* these female employees. (Docket No. 87-12 at 84-91). Finally, after reviewing documents submitted to the record, the Court also underlines that the four employees terminated on April 26, 2017, (Docket No. 87 ¶¶ 89-92; 105 ¶¶ 89-92), were hourly-employee and not salaried-employee. (Docket No. 87-6). This raises the important question as to whether any other salaried-employee, *besides* Plaintiff, suffered a weekly-salary reduction and/or was terminated as a result of the late April 2017 restructuring.

Therefore, the "temporal proximity" between Plaintiff's pregnancy announcement and all the factual background detailed above definitely weigh in favor of having a reasonable jury consider these genuine material issues of facts as to whether the evidence presented can establish that Defendants "legitimate busines reason" was a mere pretext for Plaintiff's adverse employment action. See Pagán, 2011 WL 570552 at *8; Baez-Viera v. Cooperativa Abraham Rosa, Civil No. 08-2045 (JAG), 2011 WL 3843869, at *10 (D.P.R. 2011) ("The temporal proximity is evident, and this inference the Court draws in favor of Plaintiff."); see also Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995); Morissey v. Boston Five Cents Sav. Bank, F.S.B., 54 F.3d 27, 31 (1st Cir. 1995).

Civil No. 18-1526 (GAG)

Moreover, as previously mentioned, most of the parties' evidence rely on *deposition testimony*, which would require the Court to weigh in the evidence and make impermissible credibility determinations as to witnesses, such as Plaintiff, Ms. Rivera-Martínez, Ms. Giselle Rivera-Cotty, Mr. Sanoguet-Valentín, Ms. Yaritza González, GM Pagán-Matos, and HR González-Chaparro. See CMI Capital Mkt. Inv. LLC v. Municipality of Bayamon, 239 F.R.D. 293, 297 (D.P.R. 2006) ("Credibility issues *fall outside the scope* of summary judgment. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks and citations omitted) (emphasis added); Cruz-Baez v. Negrón-Irizarry, 360 F. Supp. 2d 326, 332 (D.P.R. 2005) ("There is *no room for credibility determinations*, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood.") (internal citations and quotation marks omitted) (emphasis added).

Consequently, Defendants' Motion for Summary Judgment relating to Plaintiff's gender and pregnancy discrimination, under of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the PDA, 42 U.S.C. § 2000e(k), is hereby **DENIED** because there exist genuine material issues of facts which could affect the outcome of the case.

### B.  Hostile Work Environment Claim

Defendants advance that Plaintiff fails to establish that the "discrete incidents" which occurred since announcing her pregnancy are neither supported by the evidence of record nor constitute a "severe or perversive" enough hostile work environment. (Docket No. 88 at 10-15). Moreover, they argue that Ms. Acevedo-Milán was absent from work during the majority of the days of her pregnancy and thus, cannot claim the existence of a hostile work environment during a short 7-day period. Id. at 14. Finally, Defendants aver that Plaintiff explicitly stated during her deposition

that her hostile work environment allegation was based only on the April 25 meeting incident. (Docket No. 115 at 4-6). Ms. Acevedo-Milán opposes and presents a series of events that she understands to be "perversive or severe" enough to prove hostile work environment. (Docket No.106). For example, Plaintiff asserts that once she announced her pregnancy, numerous strategy meetings about the operations of the Sales and Marketing Department took place and she was not invited; these meetings allegedly ensued whether she was present at the office or absent due to medical leave. (Docket No.106 at 17). Additionally, she argues that GM Pagán-Matos complained to employees about the company's negative sales performance and how Plaintiff's pregnancy-related absences were affecting them. Id. Finally, Ms. Acevedo-Milán puts forward that the "humiliating" April 25 meeting further shows a hostile work environment. (Docket Nos. 106 at 15-18; 123 at 5-9).

A hostile work environment claim under Title VII exists where a "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (internal quotation marks omitted). To demonstrate this claim, Plaintiff must establish: (1) that she is "a member of a protected class;" (2) that she "was subjected to unwelcome harassment;" (3) that "the harassment was based upon the protected class;" (4) that the harassment "was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment;" (5) that "objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so," and (6) that "some basis for employer liability has been established." Pérez-Rodríguez v. Wyndham Vacation Ownership, Civil No. 12-1287 (GAG), 2014 WL 651972 at *6 (D.P.R. 2014). See also Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002).

Civil No. 18-1526 (GAG)

When applying the six-part test, the Court evaluates the claim "in light of the record as a whole and mindful of the totality of the circumstances." Pérez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 29 (1st Cir. 2011). Under the "totality of the circumstance" analysis, the Court considers the alleged harassment's "frequency, severity, whether it was physically threatening, humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance." Pérez-Rodríguez, 2014 WL 651972 at *6. In this regard, the First Circuit has consistently held that "a *single, isolated incident* of harassment is ordinarily insufficient to establish a claim for hostile work environment unless the incident was particularly egregious." Posada v. ACP Facility Servs., Inc., 389 F. Supp. 3d 149, 157 (D. Mass. 2019) (emphasis added). See Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir. 2013); Pomales v. Celulares, 447 F.3d 79, 83-84 (1st Cir. 2006); Noviello v. City of Bos., 398 F.3d 76, 84 (1st Cir. 2005).

Under the six-part test for hostile work environment, the Court rules that Plaintiff did not submit enough evidence to support this claim. Pérez-Rodríguez, 2014 WL 651972 at *6. First, Defendants have shown that Ms. Acevedo-Milán, for valid medical reasons, barely attended work after she announced the pregnancy. (Docket No. 87 ¶¶ 113-117; 120-122). This factual reality narrows down the instances in which Ms. Acevedo-Milán could have been a victim of a hostile work environment. In her absence, and also during those days when she was present at the office, Plaintiff claims that alleged discriminatory comments were made and supposed key meetings were held. (Docket No.106 at 17). Although a reasonably jury could weigh in about these disputed facts and conclude that her adverse employment may have been motivated by her pregnancy, for the present analysis, they fall short to establish a hostile work environment. Harris, 510 U.S. at 21. Notably, due to the fact that Ms. Acevdo-Milán was not even at the office when many of alleged events occurred. (Docket No. 87 ¶¶ 113-114; 105 ¶¶ 113-114). Moreover, the days Plaintiff indeed attend work, the

Civil No. 18-1526 (GAG)

evidence only supports *one* incident that can be factored into the hostile work environment claim: the April 25 meeting. (Docket No. 87-8 at 91-95). According to Defendants, Ms. Acevedo-Milán exclusively supports her hostile work environment claim on this incident. (Docket No. 115 at 4-6). As discussed before, to weigh in the evidence submitted about the April 25 meeting would require the Court to make impermissible credibility determinations. <u>Reeves</u>, 530 U.S. at 135. However, even assuming that Ms. Acevedo-Milán's version of facts is entirely accurate, this event by itself, without a continuum specific conduct of harassment, is not particularly egregious to establish hostile work environment. <u>Noviello</u>, 398 F.3d at 84.

In light of the above reasoning, Defendants' Motion for Summary Judgment relating to Plaintiff's hostile work environment claim, under of Title VII, 42 U.S.C. § 2000e-3(a), is hereby **GRANTED**.

C. <u>Retaliation Claim</u>

Defendants move for summary judgment as to Plaintiff's retaliation claim arguing that she did not suffer an adverse employment action after protesting about her position change during the April 25 meeting. (Docket No. 88 at 24-25). Moreover, Defendants posit that although TST allegedly restricted her access to the company's email and she was removed from "Whatsapp" chat work groups, these actions do not constitute retaliatory adverse employment actions. <u>Id.</u> at 25-26. Contrarily, Ms. Acevdo-Milán advances that she has established a *prima facie* retaliation claim because the actions taken after the April 25 meeting –e-mail restrictions and group chat removal– where in retaliation for expressing that she was demoted because of her pregnancy. (Docket No. 106 at 25-32). Thus, Plaintiff asserts that Defendants fail to articulate a legitimate non-discriminatory reason for said actions, which makes them a pretext for retaliation. <u>Id.</u> at 31-32. Defendants replied and aver that these alleged actions do not constitute a serious material alteration of Plaintiff's

Civil No. 18-1526 (GAG)

employment conditions. (Docket No. 115 at 18-20). Ms. Acevedo-Milán filed a sur-reply reiterating her position. (Docket No. 123 at 15-17).

A Title VII retaliation claim, pursuant to 42 U .S.C. § 2000e-3 (a), must be analyzed through the McDonnell Douglas framework. Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010). To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action, and (3) the adverse action was casually connected to the protected activity. See Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014). To prove a retaliatory adverse employment action she "must show that a reasonable employee would have found the challenged action materially adverse," which is to say that "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 1 (2006) (internal quotation marks omitted); see also Cherkaoui v. City of Quincy, 877 F.3d 14, 25 (1st Cir. 2017); Alvarado v. Potter, 813 F. Supp. 2d 247, 256 (D.P.R. 2011). "Material changes include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002) (quoting Hernández-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998); see also Natal Pérez, 291 F. Supp. 3d at 228.

If Plaintiff satisfies these elements, the burden then shifts back to Defendants to demonstrate its legitimate reasons for the adverse employment action. Sánchez-Rodríguez v. AT & T Mobility Puerto Rico, Inc., 673 F.3d 1, 15 (1st Cir. 2012). Consequently, "[t]o defeat summary judgment in a retaliation case, [she] must point to some evidence of retaliation by a pertinent decisionmaker." Id. (internal quotations marks omitted) (citations omitted) (emphasis in original).

Civil No. 18-1526 (GAG)

1
2
3
4
5
6
7

The First Circuit has further explained that "[i]n addition to protecting the filing of formal charges of discrimination . . . informal protests of discriminatory employment practices [are also protected], including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009); see also Oquendo v. Costco Wholehouse Corp., Civil No. 17-2238 (MDM), 2020 WL 1698991 at *18 (D.P.R. 2020).

8
9
10
11
12
13
14

The Court holds that Plaintiff fails to meet a *prima facie* case of Title VII retaliation because the challenged actions were not materially adverse enough to meet this standard. See Gu, 312 F.3d at 14. Ms. Acevedo-Milán's argues that she confronted HR González-Chaparro and GM Pagán-Matos during the April 25 meeting when they informed her about the demotion. Plaintiff told them that these actions were taken because of her pregnancy. Ms. Acevedo-Milán then claims that as a result of engaging in this protected conduct, she was restricted from her work e-mail and removed from the work messaging groups. (Docket No. 106 at 25-32).

15
16
17
18
19
20
21
22
23

The Court disagrees that these two job-related decisions constitute retaliatory, materially adverse actions. Hernández-Torres, 158 F.3d at 47. Defendants submitted uncontested evidence to explain that, while she was on maternity leave, an IT employee had to reset Plaintiff's work e-mail because the company needed information contained in them to continue business operations. (Docket No. 87 ¶ 130). As to the Whatsapp work chat, although unfortunate, this alleged action by itself does not amount to material adverse employment action; especially since Plaintiff was on maternity leave when this alleged removal occurred. Cherkaoui, 877 F.3d at 25. Altogether, these challenged actions did not dissuade Ms. Acevedo-Milán from making her discrimination charges. Alvarado v. Potter, 813 F. Supp. 2d at 256.

24

Civil No. 18-1526 (GAG)

Consequently, and in light of the above reasoning, Defendants' Motion for Summary Judgment relating to Plaintiff's retaliation claim, under of Title VII, 42 U .S.C. § 2000e-3 (a), is hereby **GRANTED.**

D.  Constructive Discharge

Defendants argue that Ms. Acevedo-Milán did not establish a constructive discharge claim because she cannot show that her work conditions were intolerable and given the fact that her position change was never put into effect. (Docket No. 88 at 26-28). Even if her new working conditions would have been materialized, Defendants posit that they were not objectively onerous or unpleasant to force her to resign. Id. at 28. Plaintiff opposes advancing that every incident presented to support her hostile work environment claim (discriminatory commentaries, meetings she was not invited to, and the April 25 meeting) forced her to resign. (Docket No. 106 at 33-36). The subsequent reply and sur-reply motions, respectively filed by the parties, reiterate these same arguments. (Docket Nos. 115 at 20-21; 123 at 17).

In a constructive discharge claim under Title VII. the plaintiff first must establish a *prima facie case*, that she (1) was within a protected class; (2) met the employer's legitimate performance expectations; (3) was actually or constructively discharged; and (4) was replaced by another with similar skills and qualifications. See Pennsylvania State Police v. Suders, 542 U.S. 129, 133-34, (2004); Saliceti-Valdespino v. Wyndham Vacation Ownership, 990 F. Supp. 2d 159, 160 (D.P.R. 2014).

Further, a constructive discharge claim "presents a special wrinkle that amounts to an additional *prima facie* element. In such cases, the plaintiff must prove that [her] employer imposed working conditions so intolerable that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities." Landrau Romero v. Banco Popular De Puerto

Civil No. 18-1526 (GAG)

Rico, 212 F.3d 607, 613 (1st Cir. 2000) (internal citations and quotations marks omitted). "Typically, the employer must, for example, "take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities." Blackie v. Maine, 75 F.3d 716, 725-726 (1st Cir. 1996) (internal citations omitted). Similarly, a constructive discharge "may occur when an employer effectively prevents an employee from performing [her] job." Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir.1994); see also Patrick v. Jansson Corp., 392 F. Supp. 2d 49, 55 (D. Mass. 2005).

Importantly, to prove a constructive discharge, a plaintiff "must offer evidence of *more severe harassment than that required for a hostile work environment claim*." Patrick v. Jansson Corp., 392 F. Supp. 2d 49, 55 (D. Mass. 2005) (emphasis added); see also Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 28 (1st Cir. 2002); Hernández-Torres, 158 F.3d at 48. Because this test "is objective, the employer's subjective intent is immaterial." Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732-733 (1st Cir. 1999). Instead, the employee must establish that her working conditions were "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." Marrero, 304 F.3d at 28. In making this determination, the Court is reminded that "the workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins, that is, thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." See Gautier v. Brennan, Civil No. 17-2275 (CVR), 2019 WL 2754673, at *15 (D.P.R. 2019); Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986).

The Court rules that Plaintiff fails to establish a "constructive discharge" claim because according to the evidence proffered by the parties her working conditions, before and after her demotion, were not intolerable or unpleasant enough as to force her to resign. Landrau Romero, 212

Civil No. 18-1526 (GAG)

1    F.3d at 613. More importantly, Ms. Acevedo-Milán was unable to prove a "hostile work

2    environment" claim which requires evidence of less severe harassment than that necessary to

3    demonstrate constructive discharge. Marrero, 304 F.3d at 28. Thus, if the former fails so does the

4    latter. Saliceti-Valdespino, 990 F. Supp. 2d at 160.

5        As a result of the above reasoning, Defendants' Motion for Summary Judgment relating to

6    Plaintiff's constructive discharge claim, under of Title VII, 42 U .S.C. § 2000e-3 (a), is hereby

7    **GRANTED.**

8                    E.   FMLA Claim

9        Defendants also move for summary judgment as to Plaintiff's FMLA claim and posit that, at

10   no point, Plaintiff put TST on notice about her intention to take unpaid leave under this federal

11   statute. (Docket No. 88 at 28-31). Moreover, they put forward that there is no evidence on the record

12   that Ms. Acevdo-Milán wanted unpaid leave due to the bed-rest related-absences and that when she

13   requested paid maternity leave (after suffering the miscarriage), it was granted. Id. at 30. Plaintiff

14   opposes and argues that she indeed informed Defendants about her ordered bed-rest, yet they did not

15   notify her about the entitlement to leave under the FMLA, and hence, failed to comply with their

16   statutory obligation. (Docket No. 106 at 38-41). Defendants replied and assert that Plaintiff "does

17   not even care to mention *how* she was prejudiced or point to evidence showing she was prejudiced"

18   about not being informed about her FMLA rights. (Docket No. 115 at 61) (emphasis in original).

19   They insist that Ms. Acevedo-Milán has admitted that "every time she was absent due to medical

20   reasons (from March 28 to April 25, Plaintiff was absent approximately 13 of 21 working days) *she*

21   *was paid her full salary*." Id. (emphasis in original). In her Sur-reply, Ms. Acevedo-Milán reiterates

22   the same argument about not being notified of said statutory rights. (Docket No. 123 at 17-18).

23

24

Civil No. 18-1526 (GAG)

The FMLA was enacted to help working women and men balance the competing demands of work and personal life. Hodgens, 144 F.3d at 159; 29 U.S.C. § 2601(b)(1)-(2). In terms of substantive rights, the FMLA "entitles an employee to take twelve weeks of leave during any twelve-month period for a variety of reasons, including to care for a family member -such as a parent- with a serious health condition." Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 718 (1st Cir. 2014); Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 2 (1st Cir. 2009). Upon an employee's return, her employer must reinstate her to the same or an equivalent position, without any loss of accrued seniority. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005).

To protect these rights, the FMLA make it unlawful for any employer to, among other things: (1) "interfere with, restrain, or deny the exercise" of any FMLA right; or (2) retaliate or "discriminat[e] against employees . . . who have used FMLA leave," such as by "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions[,] or disciplinary actions." Carrero-Ojeda, 755 F.3d at 718 (internal citations and quotations marks omitted); see also Germanowski, 854 F.3d at 72.

As to interference claims, which is what Plaintiff seems to be claiming in the present case, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA." Hodgens, 144 F.3d at 159. Such claims include the denial of substantive rights, as well as other actions by an employer that prevent or even "deter" employees from exercising their rights. See Knidel v. T.N.Z., Inc., 211 F. Supp. 3d 382, 393 (D. Mass. 2016). Moreover, "FMLA [interference claim] does not protect an employee from discharge for any reason while she is on leave-rather . . . it protects her only from discharge because she requests or takes FMLA leave." Carrero-Ojeda, 755 F.3d at 722 (internal citations omitted). In other words, "an employer who simply blocks an

Civil No. 18-1526 (GAG)

employee from taking leave to which she is entitled has committed non-retaliatory interference with the substantive rights afforded by the FMLA." Chacon v. Brigham & Women's Hosp., 99 F. Supp. 3d 207, 214 (D. Mass. 2015).

The Court agrees with Defendants that Plaintiff neither argues nor supports with record evidence a cognizable FMLA claim. Ms. Acevedo-Milán never requested FMLA unpaid leave. Her proposition that Defendants' failure to inform her about these rights constitutes an FMLA violation in itself is not supported by caselaw. Defendants cannot be held accountable for "blocking" or "deterring" certain statutory rights that she never requested. Carrero-Ojeda, 755 F.3d at 722. It is uncontested that when employed by Defendants, Plaintiff received paid medical leave when she was ordered bed-rest because of pregnancy complications.

Consequently, Defendants' Motion for Summary Judgment relating to Plaintiff's FMLA interference claim, under 29 U.S.C. §§ 2601-2654, is hereby **GRANTED.**

### F.   Supplemental Commonwealth law claims

When deciding whether to assert supplemental jurisdiction, the Court "must exercise informed discretion." Redondo Const. Corp. v. Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011) (citations omitted) (internal quotation marks omitted). Even though the Court is not governed by a categorical rule, it "must weigh concerns of comity, judicial economy, convenience, and fairness" when exercising jurisdiction over state law claims. Id. The suitable inquiry is "pragmatic and case-specific." Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996).

The Court will exercise supplemental jurisdiction over Law 100, Law 115, and Law 80, Article 1802 and 1803 of the Puerto Rico Civil Code, and the Commonwealth of Puerto Rico's Constitution. The advanced stage of the litigation, judicial economy and fairness compels the Court

Civil No. 18-1526 (GAG)

to decide these related Commonwealth law causes of action. Morales-Guadalupe v. Oriental Bank & Tr., Civil No. 16-1535 (GAG), 2018 WL 1116544, at *8 (D.P.R. 2018).

### 1. Law 100 (Employment Discrimination and Hostile Work Environment)

Law 100, Puerto Rico's general employment discrimination statute and Title VII's local counterpart, seeks to prevent discrimination in employment by reason of age, race, color, religion, sex social or national origin or social condition. P.R. LAWS ANN., tit 29, § 146. The Puerto Rico Supreme Court "has recognized that Law 100 is more plaintiff-friendly than its federal counterpart, Title VII." Medina v. Adecco, 561 F. Supp. 2d 162, 174 (D.P.R. 2008). While Title VII and Law 100 claims involve similar issues, "the statutes differ on their respective burden of proof allocations; Law 100 places a tougher burden on defendant." Id. However, courts have recognized that "Title VII hostile work environment claims brought under . . . Law 100 are essentially the same." Godoy v. Maplehurst Bakeries, Inc., 747 F. Supp. 2d 298, 317 (D.P.R. 2010).

Similarly to their federal counterparts, the Court hereby **DENIES** Defendants' Motion for Summary Judgment as to Ms. Acevedo-Milán's sex and pregnancy employment discrimination claim under Law 100 because of genuine material issues of facts, see CMI Capital Mkt. Inv. LLC, 239 F.R.D. at 297, yet **GRANTS with prejudice** Motion for Summary Judgment as to Plaintiff's hostile work environment claim under Law 100.

### 2. Law 115: Anti-Retaliation

Law 115 protects employees that offer testimony before an administrative, judicial or legislative forum from adverse actions by their employers. P.R. LAWS ANN. tit. 29, §§ 194a *et seq.* Provided that that Law 115 "requires the same adverse employment action showing as a Title VII retaliation claim, courts have treated the two claims the same." Godoy, 747 F. Supp. 2d at 318 (D.P.R. 2010).

Civil No. 18-1526 (GAG)

Like its federal counterpart, and in light of the same legal reasoning, the Court hereby **GRANTS with prejudice** Defendants' Motion for Summary Judgment as to Plaintiff's Law 115 employment retaliation claims.

### 3. Law 80: Wrongful Dismissal

Law 80 entitles an employee to severance pay from his employer if he is discharged without just cause. P.R. LAWS ANN., tit. 29, § 185a. First, Plaintiff bears the burden of alleging "unjustified dismissal and proving actual dismissal. If [she] does so, the employer must establish by a preponderance of the evidence that the discharge was made for good cause." Godoy, 747 F. Supp. 2d at 318; see also Hoyos v. Telecorp Communications, Inc., 488 F.3d 1, 6 (1st Cir. 2007). A "just cause" for dismissal exists when an employee is dismissed for "improper or disorderly conduct, negligent attitude towards his work, and violations of the employer's rules and regulations," among other reasons. Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998); see also Otero-Burgos v. Inter Am. Univ., 558 F.3d 1 (1st Cir. 2009).

Analogous to the Court's reasoning detailed above relating to Plaintiff's federal constructive discharge claim, Defendants' Motion for Summary Judgment as to Ms. Acevedo-Milán's Law 80 claim is hereby **GRANTED with prejudice**.

### 4. Article 1802 and 1803: Tort

Article 1802 is Puerto Rico's general tort statute, states that a person who "causes damages to another through fault or negligence" shall be liable in damages. P.R. LAWS ANN. tit. 31, § 5141. On the other hand, Article 1803 applies the principle of respondent superior to Article 1802 claims. P.R. LAWS ANN. tit. 31 § 5142. See Pagán Cólon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 16 (1st Cir. 2012).

Civil No. 18-1526 (GAG)

The Puerto Rico Supreme Court, and this District, have held that a specific employment law covers the conduct for which a plaintiff seeks damages, she is barred from using the same conduct to also bring a claim under Article 1802. See Santana-Colón v. Houghton Mifflin Harcout Pub. Co., 81 F. Supp. 3d 129, 140 (D.P.R. 2014). An additional claim under Article 1802 "may only be brought by the employee-plaintiff if it is based on tortious or negligent conduct distinct from that covered by the specific labor law invoked." Medina, 561 F. Supp. 2d 162, 176 (D.P.R. 2008) (internal citations omitted).

Based on this case' evidentiary record, Ms. Acevedo-Milán grounds her Articles 1802 and 1803 claims on the same conduct that supports her alleged employment discrimination claims under both federal and Commonwealth laws. The Court finds no independent tortious conduct by Defendants that would allow her to recover damages under the Commonwealth's general tort statute for the same conduct that is covered by her remaining Title VII and Law 100 claims.[21]

Consequently, the Court hereby **GRANTS with prejudice** Defendant's Motion for Summary Judgment as to Plaintiff's supplemental Article 1802 and 1803 Commonwealth's general torts claims.

### 5. Puerto Rico Constitution: Dignity and Privacy Rights

The Commonwealth of Puerto Rico's Constitution Article II, Section 1, 8 and 16 protect the rights to privacy, dignity, and a workplace free of risk and harm to one's personal integrity. P.R. CONST. Art. II, §§ 1; 8; 16. These rights operate *ex proprio vigore* and therefore, may be asserted against private parties. Rosario v. United States, 538 F. Supp. 2d 480, 492 (D.P.R. 2008). In other words, "due to their peculiar nature by way of exception, private parties are liable for violations

---

[21] Plaintiff claims that during the April 25 meeting she was deprived from her freedom for about 45 minute. (Docket No. 106 at 44). The Court disagrees that this incident satisfies the Commonwealth's case-law relating to Article 1802 false imprisonment or illegal depravation of liberty. See Segarra Jímenez v. Banco Popular, Inc., 421 F.Supp.2d 452, 461 (D.P.R. 2006).

Civil No. 18-1526 (GAG)

to dignity and privacy protections of their employees under our local Constitution." Id. See also Robles-Vázquez v. Tirado García, 110 F.3d 204, 208 (1st Cir. 1997); Kerr-Selgas v. American Airlines, Inc., 69 F.3d 1205, 1213 (1st Cir. 1995) (recognizing the "great importance" attached by the Puerto Rico Supreme Court to the Puerto Rico Constitution's guarantee of the right of privacy and human dignity). The application of these rights to particular factual situations is left to the "prudent discretion" of the trial courts. Mojica Escobar v. Roca, 926 F. Supp. 30, 34 (D.P.R. 1996).

The Court will exercise its "prudent discretion" and hold that given the genuine material issues of facts as to the Commonwealth's statutory sex and pregnancy discrimination claims, which encompasses possible damages, it should be left up to a reasonable jury to decide if Ms. Acevedo-Milán's human dignity and integrity was indeed violated by Defendants. Thus, the Court hereby **DENIES** Defendants' Motion for Summary Judgment as to Ms. Acevedo-Milán's Commonwealth's constitutional infringements.

### V. Defendant's Motion in Limine

Similarly pending before this Court is Defendants' Motion in Limine and for Judgment as Matter of Law as to Causation of Plaintiff's Miscarriage. (Docket No. 125). Essentially, to establish that Defendants "caused" Ms. Acevedo-Milán's miscarriage, they allege that she is required to submit expert testimony. Id. at 7-8. Defendants argue that Plaintiff has not announced an expert nor tendered an expert report. Id. at 8. The only announced witness as to the matter is Dr. Herminio Vélez ("Dr. Vélez"), who is her obstetrician-gynecologist and treating physician. Id. at 11. However, they avert that Dr. Vélez was not disclosed as an expert witness, nor can he be classify as one, who will testify about to "causation." (Docket No. 125 at 8). According to Defendants, Dr. Vélez "has no knowledge of any alleged stressful incident on April 25, 2017 nor of a meeting held on that day" and he has already testified that "bacterial vaginosis," not Defendants, caused Plaintiff's "sceptic

1  abortion." Id. at 6. For this reason, they petition the Court to exclude Dr. Vélez's testimony as to

2  causation and enter judgment in their favor as to this issue. (Docket No. 125 at 18).

3      Contrarily, Ms. Acevedo-Milán argues that Dr. Vélez has been duly and fully disclosed as

4  her treating physician and that he will only testify to his role in this capacity. (Docket No. 130).

5  Plaintiff further asserts that during a hearing before Magistrate Judge Marshall D. Morgan, she

6  informed that Dr. Vélez would be testifying as her treating physician and about the possible causes

7  of her sceptic abortion. (Docket Nos. 130 at 26, 33; 53). Ms. Acevedo-Milán advances that Dr. Vélez

8  will testify as "percipient witness" and as such he can, based on his role as her obstetrician-

9  gynecologist and according to the medical record and notes, testify as to what caused her

10  miscarriage. Id. at 27; 29-31. Finally, Plaintiff argues that throughout this case she has not limited

11  the "stress and anxiety" suffered and which she claims caused the "unwanted abortion" to a single

12  or specific event, for example, the April 25, 2017 meeting. Id. at 22-23.

13      Defendants filed reply brief reiterating that Dr. Vélez lacks personal knowledge to testify

14  about causation, yet do not address Plaintiff's argument that he will testify as "percipient witness,"

15  not an expert. (Docket No. 132-1).

16      Rule 26 imposes requirements for any "witness who is retained or specifically employed to

17  provide expert testimony in the case" by way of an expert report. FED. R. CIV. P. 26(a)(2)(B). This

18  requirement applies to a person testifying "under Rule 702 of the Federal Rules of Evidence with

19  respect to scientific technical, and other specialized matters." FED. R. CIV. P. 26(a)(2). However,

20  "[t]hat definition does not encompass a percipient [or fact] witness *who happens to be an*

21  *expert*." Gómez v. Rivera Rodríguez, 344 F.3d 103, 113 (1st Cir. 2003) (emphasis added). See also

22  Torres-Rivera v. Centro Medico Del Turabo Inc., 215 F. Supp. 3d 202, 205-06 (D.P.R. 2016)("Dr.

23  Ramdev will provide testimony arising from his role as an actor in the events giving rise to litigation,

24

Civil No. 18-1526 (GAG)

and is therefore appropriately viewed as a fact witness not subject to Rule 26's requirements for expert witnesses."); 8A Charles Alan Wright & Arthur R. Miller, Expert Witnesses-1993 Requirement for Detailed Report and Routine Depositions Regarding Retained Expert Witnesses, Federal Practice and Procedure § 2031.1 (3d ed. 2008). In Downey v. Bobs Disc. Furniture Holdings, Inc., 633 F.3d 1 (1st Cir. 2011), the First Circuit held that:

> Interpreting the words "retained or specially employed" in a common-sense manner, consistent with their plain meaning, we conclude that as long as an expert was not retained or specially employed in connection with the litigation, and his opinion about causation is premised on personal knowledge and observations made in the course of treatment, no report is required under the terms of Rule 26(a)(2)(B).

Id. at 7. This analysis led the First Circuit to conclude that if "the expert is part of the ongoing sequence of events and *arrives at his causation opinion during treatment*, his opinion testimony is not that of a retained or specially employed expert." Id. (emphasis added).

After reviewing the parties submissions and the evidence of record, notably Dr. Vélez's deposition testimony, the Court rules that he may testify at trial about Plaintiff's miscarriage and the possible causes for it. His testimony will "be closely constrained to facts based on [his] personal knowledge of the events at issue" e.g. his role as Plaintiff's treating physician and to any information she provided her during the course of the medical treatment. Ramos-Ríos v. United States, Civil No. 12-1985 (GAG), 2014 WL 6612508 at *2 (D.P.R. 2014). However, Dr. Vélez cannot testify as to *any specific events* relating to Ms. Acevedo-Milán's employment conditions at TST, for example the April 25, 2017 meeting, for which he lacks personal knowledge.

Consequently, Defendants' Motion in Limine and for Judgment as Matter of Law as to Causation of Plaintiff's Miscarriage at Docket No. 125 is hereby **DENIED**.

Civil No. 18-1526 (GAG)

### VI. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment at Docket No. 87 is hereby **DENIED IN PART and GRANTED IN PART**. Plaintiff's only remaining claims are those arising under Title VII, 42 U.S.C. § 2000e-2(a)(1), the PDA, 42 U.S.C. § 2000e(k), Commonwealth Law 100, P.R. LAWS ANN. tit. 29, § 146, and the Puerto Rico Constitution's dignity and privacy rights relating to the alleged sex and pregnancy discrimination. Similarly, Defendants' Motion in Limine and for Judgment at Docket No. 125 is hereby **DENIED**, yet the Court constrains the scope of Dr. Vélez's testimony.

**SO ORDERED.**

In San Juan, Puerto Rico this 30th of September, 2020.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge